Michael R. Lozeau (State Bar No. 142893)
  michael@lozeaudrury.com
Richard T. Drury (State Bar No. 163559)
  richard@lozeaudrury.com
Christina M. Caro (State Bar No. 250797)
  christina@lozeaudrury.com
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel:  (510) 836-4200
Fax: (510) 836-4205 (fax)

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>DAVIS WASTE REMOVAL CO., INC., a corporation,<br><br>          Defendant. | Case No. 2:10-cv-02079-GEB-JFM<br><br>**[PROPOSED] CONSENT DECREE** |

**WHEREAS**, Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, dedicated to the protection, enhancement, and restoration of the Suisun Bay, the San Francisco Bay, and other California waters. Bill Jennings is the Chairperson and a member of CSPA.

**WHEREAS**, Defendant DAVIS WASTE REMOVAL CO., INC. ("Defendant" or "DWR") is a corporation organized under the laws of California.

**WHEREAS,** Defendant operates a recycling facility located at 2727 Second Street in Davis, California.  The Facility receives, sorts, and processes a variety of materials for recycling.

**WHEREAS**, Defendant discharges storm water at the Facility pursuant to State Water Resources Control Board Water Quality Order No. 97-03-DWQ, National Pollutant Discharge

Elimination System General Permit No. CAS000001, Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities (hereinafter, the "General Permit").  A map of the Facility is attached hereto as Exhibit 1 and incorporated by reference;

**WHEREAS**, on or about June 1, 2010, CSPA served Defendant, the United States Attorney General, the national and Region IX offices of the United States Environmental Protection Agency, the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Board – Central Valley Region ("Regional Board") with a Notice of Violation and Intent to File Suit ("60-Day Notice") under Sections 505(a)(1) and (f) of the Federal Water Pollution Control Act (the "Act" or "Clean Water Act"), 33 U.S.C. § 1365(a)(1) and (f);

**WHEREAS**, the 60-Day Notice alleged that Defendant has violated and continues to violate Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. § 1311(a) and 1342(p), due to discharges of polluted storm water from the Facility in violation of the General Permit;

**WHEREAS**, on August 5, 2010, CSPA filed a complaint against Defendant in the United States District Court for the Eastern District of California, entitled *California Sportfishing Protection Alliance v. Davis Waste Removal Co., Inc.* (Case No. 2:10-cv-02079-GEB-JFM) (hereinafter "Complaint" or "Action").  A true and correct copy of the Complaint as well as the 60-Day Notice is attached hereto as Exhibit 2;

**WHEREAS**, Defendant Davis Waste Removal denies any and all claims in the Notices;

**WHEREAS,** Defendant Davis Waste Removal maintains that is has been, at all relevant times, and continues to be, in compliance with the Clean Water Act, The General Permit, and denies the occurrence of the violations alleged in the Notices;

**WHEREAS**, CSPA and Defendant (hereinafter, collectively referred to as the "Settling Parties") have agreed that it is in the parties' mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the Complaint without further proceedings;

**WHEREAS**, after agreement of the Settling Parties to this proposed Consent Decree, the proposed Consent Decree will be submitted to the United States Department of Justice and the national

and Region IX offices of the United States Environmental Protection Agency for the statutory review period pursuant to 33 U.S.C. § 1365(c) at least 45 days prior to the submittal of this Consent Decree to the Court for entry;

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS**:

1. DWR agrees, to the extent it has not already done so, to operate the Facility in compliance with the applicable requirements of the General Permit and Clean Water Act.  If, because of any other court order, change in law, and/or upon the effective date of an amended or revised General Permit, the applicable requirements of the General Permit and Clean Water Act should change, DWR agrees to comply with the controlling law, including revisions to the General Permit as authorized by law.

2. In order to prevent storm water from coming into contact with contaminants at the Facility and/or to prevent the discharge of waste or contaminated storm water from the Facility into the waters of the State and of the United States, DWR shall implement additional and/or different structural and non-structural best management practices ("BMPs") as described more fully below. DWR shall maintain all structural BMPs at the site in good operating condition.  The effectiveness of the BMPs shall be measured by comparing analytical results of storm water discharge samples with the "Levels of Concern" set forth in Paragraph 22.  Exceeding Levels of Concern shall cause the initiation of actions as discussed below.

## IMPROVEMENTS TO THE FACILITY'S
## STORM WATER POLLUTION CONTROL MEASURES

3. By not later than November 2, 2011, DWR shall install and maintain the Baker Corp. Box Culvert Filtration System ("Filtration System") as illustrated in Exhibit 3.  The Filtration System shall have the reported capacity to handle a design intensity of 0.2 inches per hour at the Facility (based upon the cumulative rainfall intensity curve Sacramento 5 ESE (7633) from the California Stormwater Handbook).  The Filtration System shall fully capture and treat 95 percent of the volume of runoff generated from the 1-hour storms as measured by runoff flowing through the Filtration System.  All

storm water falling on the facility (except as provided in paragraph 5 below) shall be collected and conveyed to the intake of the Filtration System.  Any storm water flows exceeding the capacity of the Filtration System shall be by-passed through the by-pass weir identified on Exhibit 4.  The Filtration System shall fully capture and treat 85 percent of the total annual volume of storm water runoff resulting from the rain falling on the Facility in an "average rainfall year".  An 'average rainfall year" shall be defined as 17.26 inches.  By agreeing to this minimum requirement, CSPA expressly does not concur that the Filtration System achieves the BAT or BCT standards.

4. As of the effective date of this Agreement, CSPA takes the position that a treatment system achieves BAT/BCT at the Facility if it captures and treats 95 percent of the total annual volume of storm water runoff resulting from the rain falling on the Facility in an "average rainfall year," as that term is defined in Paragraph 3.  At the conclusion of each rainy season, if the Filtration System fails to capture and treat 95 percent of the total annual volume of storm water runoff resulting from the rain falling on the Facility in the "average rainfall year," DWR shall prepare the written memorandum report and the parties shall engage in the meet and confer process set forth at Paragraphs 22 to 30 below.

5. DWR may reroute directly to a municipal storm drain storm water raining on the front of the employee parking area and the western half of the roof of the office building as depicted on the attached Exhibit 1.

6. By not later than September 1, 2012, DWR shall install three continuous flow meters that shall measure and record the total volume of all storm water fully treated at the Facility and the total volume of all storm water bypassing the treatment system and discharging from the Facility (excluding the flows addressed in Paragraph 5 above).  A continuous flow meter shall be installed to measure all flow in the influent pipe labeled "East Side of Facility" ("East Side Flow") shown in Exhibit 4 to this Consent Decree, which exhibit is hereby incorporated by reference.  A second continuous flow meter shall be installed to measure all flow in the influent pipe labeled "West Side of Facility" shown in Exhibit 4 ("West Side Flow").  A third continuous flow meter shall be installed to measure all flow exiting the pipe labeled "Treated Storm Water" " shown in Exhibit 4 ("Total Treated

Flow"). DWR shall measure and report the total volume of all storm water bypassing the treatment system and discharging from the facility (excluding the flows addressed in Paragraph 5 above) by subtracting the Total Treated Flow from the sum of the West Side Flow plus the East Side Flow (i.e. Total Bypass = (West Side Flow + East Side Flow) - Total Treated Flow). DWR stipulates that this method of calculating the volume of storm water bypassing the Filtration System is technically appropriate and accurate. The storm water flow records shall be compiled monthly. DWR will pursue installation of a digital logging flow meter as part of the permanent system.

7. By September 1, 2012, DWR shall provide CSPA with a description of the installed flow meters, including their type, location, and flow capacity. In the interim, DWR shall provide CSPA with flow records for the amount of treated water under the existing system along with notes and dates indicating if, when, and for how long there is bypass from the existing system based upon visual observation, the protocol for this visual observation, and an estimate of the volume of water bypassing the system. . From September 2012 through February 2013, DWR shall e-mail and send via first class mail to CSPA the flow records obtained for each of those months by the 15th of the following month. For each wet season, DWR shall e-mail and send via first class mail the compiled flow records for the entire wet season to CSPA not later than July 30th following the conclusion of each wet season. At the request of CSPA, the parties shall promptly meet and confer regarding any question about the adequacy or location of the flow meters.

8. DWR agrees to contract with a mutually agreed upon company to provide regenerative sweeping services at the Facility on a twice monthly basis, in lieu of use of mechanical brush sweepers, for all sweeping required under the Facility's Storm Water Pollution Prevention Plan ("SWPPP").

9. DWR agrees to have a staff person perform cleaning of any and all oil stains, grease stains, and any other vehicle fluid leakage in all areas of the Facility in which Facility vehicles are parked or stored no less than three (3) days per week, at all times during the year.

10. DWR agrees to cover any and all idle vehicles, meaning vehicles not in regular use by the Facility for more than thirty (30) days at a time, as well as any other surplus Facility equipment not in regular use by the Facility for the same period of time, and which is stored outdoors, using

impervious tarp-like covers, or the functional equivalent of such covers, which cover the idle vehicle or equipment. The covering shall be designed and implemented so as to prevent storm water from coming in contact with the covered vehicles or equipment. This condition is required to be met only during the period from October 1 to May 30 of each year.

11. DWR shall install and maintain in proper working order a Triton storm water filter at the drop inlet at the northeast end of the Facility property, in the unpaved storage area, which drop inlet did not have a filter in place at the time of CSPA's tour.

12. DWR agrees to the following improvements in its outdoor storage bins: DWR agrees to utilize watertight storage bins for the collection and retention of all street sweepings that are collected and stored at the Facility for any period of time. DWR shall not discharge any water collected in such storage bins to any storm drains.

13. Not later than October 1, 2011, DWR agrees to install a protective coating on the roof of its northern maintenance building, in order to prevent the leaching of metals from the roof during rain events.

14. All maintenance, repair, and replacement activities relating to the storm water pollution control measures contained in this Consent Decree shall be recorded and described on appropriate written records. Such records shall include, but not be limited to, filter repairs and/or replacements. The written records for each wet season shall be kept with the remaining written records required under the Facility's SWPPP.

## SAMPLING, MONITORING, INSPECTION AND REPORTING

In addition to, or in conformance with, any recordation, sampling, monitoring or inspecting activities described above, or otherwise required by law, DWR agrees to perform the additional monitoring described herein during the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 wet seasons (October 1 – May 30, each year):

15. DWR shall maintain logs of all sweeping activities at the Facility, including the date and location of any sweeping, as part of the Facility's annual report.

16. DWR shall collect samples from the Facility's existing monitoring locations or, upon

installation of the Filtration System, as set forth in Paragraphs 3-5 above, from an effluent monitoring point associated with the new unit.  DWR shall analyze each storm water sample taken from the existing monitoring locations in accordance with the General Permit and this Agreement for, at a minimum, the following constituents: pH, total suspended solids, oil & grease and total organic carbon, specific conductance, iron, lead, aluminum, copper, zinc, and chemical oxygen demand.

17. In addition to the General Permit's sample analysis requirements, DWR agrees to analyze all samples for total zinc, iron, and copper as well as hardness.

18. If the average analytical results for all samples of a given pollutant taken of effluent from the Filtration System during any single sampled rain day during the term of this Consent Decree indicate pollutants at levels in excess of the Levels of Concern described in Paragraph 22 below, DWR shall engage the vendor of the Filtration System or other qualified consultant to review the data and the Filtration System's performance, analyze the feasibility of additional modifications or additions to the units designed to further reduce pollutant levels in the effluent discharged from the units, and propose an implementation schedule for any feasible modifications or additions to the units.

19. All samples collected from the DWR Facility shall be delivered to a California state accredited environmental laboratory and shall be analyzed in accordance with the provisions of the General Permit.

20. Analytical methods used by DWR or its analytical laboratory shall be adequate to detect the individual constituents at or below the Levels of Concern set forth in Paragraph 22.

21. Results from DWR's sampling and analysis shall be provided to CSPA within fourteen (14) days of receipt of the final written laboratory report from each sampling event.

## MEET AND CONFER REGARDING EXCEEDANCE OF LEVELS OF POTENTIAL CONCERN AND VOLUME OF RUNOFF TREATED

22. If analytical results of storm water samples taken by DWR during the 2011-2012, 2012-2013, 2013-2014 and/or 2014-2015 wet season indicate that storm water discharges from the Facility exceed the following Levels of Concern – pH – 6.0-9.0 units; total suspended solids ("TSS") – 100

mg/L; oil and grease ("O&G") – 15 mg/L; chemical oxygen demand ("COD") – 120 mg/L; total organic carbon ("TOC") – 110 mg/L; aluminum – 0.75 mg/L;  zinc – 0.117 mg/L; iron –1.0 mg/L; copper –0.0636 mg/L, , lead –0.0816 mg/L,; and specific conductance – 200 μmhos/cm. – DWR agrees to take additional feasible measures aimed at reducing pollutants in the Facility's storm water to levels at or below these levels.

23. In furtherance of that objective, when one or more analytical results of storm water samples taken by Davis Waste during the 2011-2012, 2012-2013, 2013-2014 and/or 2104-2015 wet season indicate that storm water discharges from the Facility exceed the following Levels of Concern, DWR shall prepare a written statement ("Memorandum") discussing:

    (1) Any exceedance or exceedances of any Level of Concern;

    (2) An explanation of the possible cause(s) and/or source(s) of any exceedance; and

    (3) Additional feasible best management practices ("BMPs") that will be taken to further reduce the possibility of future exceedance(s).

24. Additionally, if, during any of the 2011-2012, 2012-2013, 2013-2014 and/or 2014-2015 wet seasons, the Filtration System fails to capture and treat 95 percent of the total annual volume of storm water runoff resulting from the rain falling on the Facility in an "average rainfall year," as set forth in Paragraph 4 above, DWR shall also include in the Memorandum information and analysis addressing the following:

    (1) A technical analysis of the actions and alternatives DWR believes are required for the Facility to meet the 95 percent capture and treatment rate;

    (2) An explanation of the costs of each alternative that DWR estimates would be entailed for the Facility to meet the 95 percent capture and treatment rate; and

    (3) Based on the technical analysis and estimated costs, an identification of the additional feasible mitigation measures DWR shall take to achieve, or make substantial progress toward achieving, the 95 percent capture and treatment rate and appropriate implementation schedule(s).

25. Such Memorandum shall be e-mailed and sent via first class mail to CSPA not later than

July 30th following the conclusion of each wet season.  Any additional measures set forth in the Memorandum shall be implemented as soon as practicable, but not later than sixty (60) days from the due date of the Memorandum, except where 1) structural changes require longer than sixty (60) days to complete; 2) weather-related conditions render immediate implementation infeasible; or 3) the Settling Parties agree in writing to defer implementation of specific measures in order to effectively meet and confer in accordance with Paragraph 26.  Within thirty (30) days of implementation, DWR's SWPPP shall be amended to include all additional BMP and other measures designated in the Memorandum.

26. Upon receipt of the Memorandum, CSPA may review and comment on any additional measures.  If requested by CSPA within thirty (30) days of receipt of such Memorandum, CSPA and DWR shall meet and confer and conduct a site inspection within ninety (90) days after the receipt of the Memorandum to discuss the contents of the Memorandum and the adequacy of proposed measures to reduce the discharge of untreated storm water and/or improve the quality of the Facility's storm water to levels at or below the Levels of Concern.  If within thirty (30) days of the Settling Parties meeting and conferring, the Settling Parties do not agree on the adequacy of the additional measures set forth in the Memorandum, the Settling Parties may agree to seek a settlement conference before a Mediator assigned to this action by the District Court pursuant to Paragraph 35 below.  If the Settling Parties fail to reach agreement on additional measures, CSPA may bring a motion before the District Court Judge consistent with Paragraph 35 below.  If CSPA does not request a meet and confer regarding the Memorandum within the thirty (30) day comment period provided for in this paragraph, CSPA shall waive any right to object to such Memorandum pursuant to this Agreement.

27. Any concurrence or failure to object by CSPA with regard to the reasonableness of any additional measures required by this Agreement or implemented by DWR shall not be deemed to be an admission of the adequacy of such measures should they fail to bring the Facility's storm water within the General Permit's best available technology requirements.

28. In addition to any site inspections conducted as part of meeting and conferring on additional measures set forth above, DWR shall permit representatives of CSPA to perform one (1) additional site visit to the Facility during normal daylight business hours during the term of this

Agreement; provided that CSPA provides DWR with at least one week prior notice via e-mail and telephone using the contact information listed in Paragraph 45 below.

29. Within thirty (30) days of the Effective Date of this Consent Decree, DWR shall amend the Facility SWPPP to incorporate all changes, improvements and best management practices set forth in this Consent Decree. A copy of the amended SWPPP shall be provided to CSPA within seven (7) business days of completion.

30. During the life of this Consent Decree, DWR shall provide CSPA with a copy of all documents submitted to the Regional Board or the State Board concerning the Facility's storm water discharges, including but not limited to all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit. Such documents and reports shall be mailed to CSPA contemporaneously with submission to such agency. DWR also shall provide CSPA a copy of all documents referenced in this agreement, including but not limited to logs or analyses, within fourteen (14) days of a written request (via e-mail or regular mail) by CSPA.

## **MITIGATION FEES AND COSTS**

31. As mitigation of the violations alleged in CSPA's Notice and Complaint, DWR shall pay the sum of Fifty-Five Thousand Dollars ($55,000.00) (the "Payment") to the Rose Foundation for Communities and the Environment ("Rose Foundation"). The Payment shall be conditioned on the following: (a) the Payment or any portion thereof shall not be disbursed or otherwise granted directly or indirectly to CSPA or DWR, (b) projects funded by the Payment shall be designed to benefit water quality in the Sacramento River Delta, the Sacramento River or Putah Creek, and (c) projects funded by the Payment shall be designed to benefit water quality within 50 miles of the Facility. Within fifteen (15) days of the Effective Date of the Consent Decree, DWR shall make the Payment to the Rose Foundation.

32. DWR shall reimburse CSPA in the total amount of $62,000 to defray CSPA's investigation fees and costs, expert fees and costs, reasonable attorneys' fees, and all other costs incurred as a result of investigating the activities at the Facility, bringing these matters to DWR's attention, and negotiating a resolution of this action in the public interest. Such payment shall be made

within fifteen (15) days of the Effective Date of the Consent Decree.  The payment shall be made payable to "Lozeau Drury LLP."

33.  DWR shall reimburse CSPA up to five thousand dollars ($5,000) per year for three years for reasonable costs and fees associated with monitoring DWR's compliance with this Consent Decree.  Monitoring activities include site inspections, review of water quality sampling reports, review of annual reports, discussion with representatives of DWR concerning potential changes to compliance requirements, preparation and participation in meet and confer sessions and mediation, water quality sampling, etc.  Annual payments shall be made payable to "Lozeau Drury LLP" within thirty (30) days of receipt of an invoice from CSPA which contains a daily and hourly description of charges and costs incurred by CSPA to monitor implementation of the Consent Decree during the previous twelve (12) months.

## DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE

34.  The Effective Date shall be the date this Consent Decree is approved and entered by the Court.  The Consent Decree shall continue in effect until September 30, 2015.  This Court shall retain jurisdiction in this matter from the Effective Date through the date of its termination, for the purposes of enforcing the terms of this Consent Decree.  In addition, following the date of termination of this Decree, this Court shall retain jurisdiction for the purposes of enforcing this Decree for any disputes which arose prior to the termination of the Consent Decree.

35.  Except as specifically noted herein, any disputes with respect to any of the provisions of this Consent Decree shall be resolved through the following procedure.  The Settling Parties agree to first meet and confer to resolve any dispute arising under this Consent Decree.  The Settling Parties shall meet and confer within fourteen (14) days of receiving written notification from the other Party of a request for a meeting to determine the merits of the dispute or whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the violation or dispute.  In the event that such disputes cannot be resolved through this meet and confer process or the Settling Parties fail to meet and confer, the Settling Parties agree to request a settlement meeting before a magistrate judge of the District Court or a Court-appointed mediator.  In the event that the Settling

Parties cannot resolve the dispute by the conclusion of the settlement meeting with the Magistrate Judge or mediator, the Parties may submit the dispute via motion to the District Court Judge. The prevailing party may seek recovery of reasonable attorney fees and costs incurred in bringing any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) or any other legal authority, and applicable case law interpreting such provisions. The parties expressly consent to have all disputes arising from this Consent Decree resolved by the District Court, and the Settling Parties waive any appeal or judicial review of a decision entered by the District Court Judge made within the parameters of this Consent Decree.

## MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

36. In consideration of the above, and except as otherwise provided by this Consent Decree, the Settling Parties hereby forever and fully release each other and their respective successors, assigns, officers, agents, employees, and all persons, firms and corporations having an interest in them, from any and all claims and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions or causes of action, either at law or in equity, which the Settling Parties have against each other arising from CSPA's allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to and including the Termination Date of this Consent Decree.

37. The Settling Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Except as otherwise provided by this Consent Decree, the Settling Parties hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from the allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to and including the Termination Date of this Consent Decree.

38. The Settling Parties enter into this Consent Decree for the purpose of avoiding

prolonged and costly litigation.  Nothing in this Consent Decree shall be construed as, and DWR expressly does not intend to imply, any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Decree constitute or be construed as an admission by DWR of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Settling Parties under this Consent Decree.

39.     CSPA shall submit this Consent Decree to the U.S. EPA and the U.S. Department of Justice (hereinafter, the "Agencies") via certified mail, return receipt requested, within five (5) days after the Effective Date of this Consent Decree for review consistent with 40 C.F.R. § 135.5.  The Agencies' review period expires forty-five (45) days after receipt of the Consent Decree by both Agencies, as evidenced by the return receipts, copies of which shall be provided to DWR upon receipt by CSPA.  In the event that the Agencies comment negatively on the provisions of this Consent Decree, CSPA and DWR agree to meet and confer to attempt to resolve the issue(s) raised by the Agencies.  If CSPA and DWR are unable to resolve any issue(s) raised by the Agencies in their comments, CSPA and DWR agree to expeditiously seek a settlement conference with the Judge assigned to the Complaint in this matter or Court-appointed mediator to resolve the issue(s)

## MISCELLANEOUS PROVISIONS

40.     The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

41.     In the event that any of the provisions of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

42.     The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

43.     The undersigned are authorized to execute this Consent Decree on behalf of their respective parties and have read, understood and agreed to all of the terms and conditions of this Consent Decree.

44.     All agreements, covenants, representations and warranties, express or implied, oral or

written, of the Settling Parties concerning the subject matter of this Consent Decree are contained herein.

45. Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to CSPA pursuant to this Consent Decree shall be e-mailed and sent by U.S. Mail, postage prepaid, and addressed as follows:

> Bill Jennings, Chairman
> California Sportfishing Protection Alliance
> 3536 Rainier Road
> Stockton, CA 95204
> Tel: (209) 464-5067
> Email: deltakeep@aol.com

With copies sent to:

> Michael R. Lozeau
> Christina M. Caro
> Lozeau Drury LLP
> 410 12th Street, Suite 250
> Oakland, CA 94607
> Tel: (510) 836-4200
> Email: michael@lozeaudrury.com
> Email: christina@lozeaudrury.com

Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to DWR pursuant to this Consent Decree shall be sent by e-mail and U.S. Mail, postage prepaid, and addressed as follows:

> Paul Hart / John Geisler
> Davis Waste Removal Co., Inc.
> 2727 2nd Street
> Davis, CA 95616
> Tel: (916) 756-4646
> Email: JGeisler@dwrco.com

///

///

- 14 -
[PROPOSED] CONSENT DECREE                             2:10-cv-02079-GEB-JFM

With copies sent to:

>Michael Brady, Esq.
>Brady & Vinding
>400 Capitol Mall, Suite 2640
>Sacramento, CA 95814
>Tel: (916) 446-3400
>Email: mbrady@bradyvinding.com

Each party shall notify the other parties of any change in their contact information within 14 days of any such change.

46. Signatures of the Settling Parties transmitted by facsimile or by e-mail shall be deemed binding.

47. No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure." A Force Majeure event is any act of God, war, fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event does not include normal inclement weather, such as anything less than or equal to a 100 year/24 hour storm event or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

48. Where implementation of the actions set forth in this Consent Agreement becomes impossible within the deadlines set forth in those paragraphs, despite the timely good faith effort of the Parties, the party who is unable to comply shall notify the other in writing within seven (7) business days of the date that the failure becomes apparent, and shall describe the reason for the non-performance. The Parties agree to meet and confer in good faith concerning the non-performance pursuant to Paragraph 35 and, where the Parties concur that the non-performance was or is impossible, despite the timely good faith efforts of one of the Parties, new performance deadlines shall be established. In the event that the Parties cannot timely agree upon the terms of such a stipulation, either Party shall have the right to seek enforcement of this agreement as provided in Paragraphs 34 and 35.

///

49. If for any reason the Court should decline to approve this Consent Decree in the form presented, the Settling Parties shall agree to work together to modify the Consent Decree within 30 days so that it is acceptable to the Court.

50. Nothing in this Consent Decree shall preclude DWR from implementing protective measures for storm water drainage in excess of the protections set forth herein.

51. The Settling Parties hereto enter into this Consent Decree, Order and Final Judgment and submit it to the Court for its approval and entry as a final judgment.

Dated: _____  California Sportfishing Protection Alliance

By: _____
    Bill Jennings, Executive Director

Dated: _____  Davis Waste Removal Co., Inc.

By: _____
    Paul Hart, President

**APPROVED AND SO ORDERED.**

**Date: 5/3/2012**

_____
GARLAND E. BURRELL, JR.
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28